JANVIER, Judge.
Plaintiff, Mrs. Euna McEIveen Belshe, wife of William Harvey Belshe, who is the other plaintiff, sustained serious physical injuries when she and a taxicab came into violent contact shortly after midnight in the early morning of September 24, 1953, near the neutral ground of Tulane Avenue at the intersection of South Claiborne Avenue, in New Orleans.
The taxicab was owned by Woodrow Wilson Gant and was being operated by Edward Gant, and in accordance with the *720 requirements of Municipal Ordinance No. 16,605, C.C.S., there had been posted with the authorities a bond under which Nola Cabs, Inc., assumed liability to pay to such person or persons as might be injured by the negligent operation of the said cab not more than $5,000 to any one person nor more than $10,000 to any two or more persons.
Alleging that the accident had been caused solely by negligence of Edward Gant, the driver of the cab, in failing to avoid striking Mrs. Belshe, she and her husband brought suit against him, as well as against Woodrow Wilson Gant and Nola Cabs, Inc., praying for solidary judgment against all three in the sum of $42,-700. They prayed for trial by jury.
The three defendants admitted the ownership of the cab by Woodrow Wilson Gant, its operation by Edward Gant, the posting of the bond by Nola Cabs, Inc., and the occurrence of the accident. Nola Cabs, Inc., however, especially setting forth the bond limits already stated and all defendants denying any negligence on the part of the operator of the cab, and averring, in the alternative, that if there was any such negligence the true cause of the accident was the contributory negligence of Mrs. Belshe in walking into the side or into the path of the oncoming taxicab when it was no longer possible for it to be brought to a stop.
There was a verdict in favor of Mrs. Belshe alone and against all three defendants in the sum of $8,200. Mrs. Belshe then filed a motion to remit up to the sum of $3,200 insofar as the verdict was against Nola Cabs, Inc., reducing the amount thereof as against that company to the limit of $5,000 for the injury of any one person as fixed in the bond. All defendants filed a-rule for a new trial. A new trial was granted and the matter was transferred for the second trial to another division of the Civil District Court for the Parish of Orleans. At this second trial, because of the absence of an important witness, it was agreed that the attorneys would readh to the jury the evidence which had beeni taken and transcribed at the first trial.. This was done and the matter was submitted to the second jury on this record.. There resulted a divided verdict of ten to' two in favor of both plaintiffs in the sum of $4,300 solidarily against all three defendants. The District Judge refused to' grant a new trial and signed the judgment, in accordance with the jury verdict. Aik defendants have appealed suspensively.
Shortly after midnight Mrs. Belshe, an!', unusually stout woman 60 years of age,, left the rear entrance of the Charity Hospital in New Orleans and walked down the riverside sidewalk of South Claiborne Avenue towards Tulane Avenue, intending' to cross to the lower side of Tulane Avenue. She was. accompanied by her nephew,. Spencer McMillin. South Claiborne Avenue is an extremely wide main traffic artery having two wide roadways separated by a very broad neutral ground. Tulane Avenue is also a much used thoroughfare having two fairly wide roadways and a neutral ground which, however, is much narrower than is the neutral ground of Claiborne-Avenue. At the intersection are several automatic semaphore signal lights, one of which, on the neutral ground of Tulane-Avenue, directly faced Mrs. Belshe as she entered the roadway on the upper side of' Tulane Avenue. Mrs. Belshe and her nephew both say that as they neared the-curb line of Tulane Avenue, they looked; to their left and saw the headlights of two-approaching automobiles which were on. the upper roadway of Tulane Avenue and; were going towards the Mississippi River,, one in the lane nearest the neutral ground, and the other in the second lane, and that, these two cars were apparently a block or a block and a half away. This is corroborated by the driver of the two cars.
C. J. Henrichs, who is a witness, was-operating the cab which was in the second lane and Edward Gant was driving the cab which was near the neutral ground„It was raining at the time. Some of the: *721 witnesses say that tHere was only a drizzle. Henrichs says that it was raining “very heavily * * * but it wasn’t a downpour.”
Mrs. Belshe and her nephew stepped into the roadway of Tulane Avenue — whether alongside each other is a disputed question — some saying that they were together and others that McMillin must have crossed first with Mrs. Belshe following some distance behind him. It is evident that when the accident occurred McMillin had reached the neutral ground and was standing on it when his aunt was struck by or walked into the side of the second cab which was driven by Gant. Henrichs, the driver of the first cab, which was in the second or middle lane of Tulane Avenue, says that he saw Mrs. Belshe as she approached the lane in which he was driving his car and that he thought that she would stop as pedestrians so often do and would allow his car to pass, but that when he realized that she was not. going to stop, he swerved his car to its right in order to pass around her as she continued on her way towards the neutral ground. This maneuver on the part of Henrichs exposed Mrs. Belshe to the view of Gant, the operator of the other cab, and before it could be brought to a stop, Mrs. Belshe had either walked into its right side near the front or had been struck by the front of Gant’s cab. She was knocked into the air damaging the right end of the outside sun visor with which that car was equipped and' shattering the right side of the glass windshield.
The impact occurred so soon after Henrichs had swerved his car that Gant apparently did not see Mrs. Belshe. He says that Henrichs swerved “to his right * * * and just then I heard a noise.” He applied his brakes and, as already stated, the only damage sustained by his car was bending of the right end of the sun visor and the shattering of the right end of the windshield, both of which are five or six feet from the front end of’ the car.
Counsel for plaintiffs argues that Mrs. Belshe must have been struck by the front bumper of the car since her left leg was fractured. This is not necessarily so. As shown she is a very heavy person and the impact with the car must have caused her to fall across the rear end of the hood and then to the ground and it is possible that the leg was fractured by impact with the side of the car or when she struck the ground rather than by the front bumper.
Gant brought this cab to a stop when about nine feet beyond the point at which the impact took place.
It is not contended that the speed of either car was excessive, it being shown that they were running at about the same speed, which was about 20 or 25 miles per hour. In fact, the claim of' Mrs. Belshe is largely based on the contention that the speed of the Gant cab was so moderate that if Gant had been on the alert he would have seen Mrs. Belshe, would have realized her peril and could have stopped his car before it came into contact with her.
The principal arguments on behalf of Mrs. Belshe are, first, that the traffic light was favorable for her and unfavorable for the taxicab, and second, that even if she was negligent in placing herself in a position of peril, Gant had the last clear chance to avoid the accident and could have done so had he been maintaining a proper lookout ahead.
Defendants maintain, on the other hand, that as the two cabs, that of the defendant Gant and that of the other driver, Hen-richs, approached the intersection, the light changed from red to green and that therefore both cars, after reducing speed, continued across, the Henrichs car in the center lane and a little to the right of the Gant car and a short distance in advance of it; that as Mrs. Belshe left the sidewalk in the face of an unfavorable light, she' was seen by Henrichs but was not and could not be seen by Gant because she was directly screéned from his view by *722 the Henrichs car, and that this situation continued until the Henrichs car suddenly swerved to its right and exposed Mrs. Belshe to the Gant car.
There is really nothing to contradict the statements of Henrichs and Gant as to the relative positions of the two cars, and the only serious question on this point is presented by the contention that, in spite of this screening of Gant’s view by the Hen-richs car, he, after discovering the peril of Mrs. Belshe, had sufficient time to bring his slow moving vehicle to a stop.
The record leaves no doubt at all that the light was favorable to the two cars and unfavorable to' Mrs. Belshe. Both Gant and Henrichs say that it was, and while Mrs. Belshe and McMillin testified that the light was favorable for them, the record shows that McMillin had given a signed statement to the police on the night of the accident and in that statement had said: “I noticed that the traffic signal light was on ‘caution’ * *
We think too, that other statements of both Mrs. Belshe and McMillin indicate that though they said that the light was green when they entered the roadway, in reality they had not looked at the light after reaching a point about 35 feet or so from the curb. Mrs. Belshe, when asked whether she had looked at the two oncoming cars after first seeing them, when she was about 35 feet from the curb line and the cabs were about a block or a block and a half away, said that she had not looked again but had “hurried right on across.”
Until the Henrichs car reached the lake side of the river side roadway of Claiborne Avenue, Henrichs, having seen Mrs. Bel-she walking toward the lane on which his car was to pass, felt that she would stop and allow it to pass in safety. It was only after that, that he realized that she was not going to do so and that he then swerved his car to the right to pass behind her. At that time when he commenced to swerve, his car was certainly not more than 25 feet from Mrs. Belshe. If both cars were traveling at about 20 miles an hour as the evidence indicates, they were traversing about 29 feet a second and since the Gant car was only a few feet in the rear of the Henrichs car, it was not more than about 20 or possibly 30 feet away from Mrs. Belshe when she was first exposed to the view of Gant. If she was as much as 30 feet away his car covered that distance in just about one second. This certainly was not sufficient for the reaction which even the most observant human requires, and there did not remain sufficient time for this reaction and the application of his brakes to bring the car to a stop.
That the Gant car was only a few feet in the rear of the Henrichs car is shown by the testimony of both drivers and also by the testimony of McMillin who says that when he saw the headlights of the cars “they could be side by side or they could be one behind the other.”. Henrichs, when asked whether the Gant car was alongside him, said: “that’s right, right with me, at the same speed I was driving.” And a little later he said: “I was ahead of him.” Obviously he could not have meant that he was much ahead of Gant. Gant, referring to the Henrichs car, said: “He was just ahead of me * * * on the side and just a little in front.”
We attach little importance to the fact that Henrichs said that just after he heard the crash when the other car struck Mrs. Belshe he looked into his rear view mirror and “saw her go flying through the air.” Counsel for plaintiffs argues from this that Gant must have been some distance behind Henrichs or the latter could not have seen this through his rear view mirror and that if Gant was far behind he must have had time to stop. Gant applied his brakes and Henrichs did not and therefore when the actual impact took place, the Henrichs car was 25 or 30 feet ahead and had swerved to its right so that the impact actually took *723 place 25 or 30 feet back of his car and directly behind it.
Then, too, it must be remembered that the swerve which Henrichs says that he made to his right was not sudden but, to use his own language, was “gradual,” so that the movement of his car to the right did not immediately expose Mrs. Belshe to the view of Gant.
Our conclusion is that there was nothing that Gant could have done to avoid the accident. He did not see and could not have seen Mrs. Belshe in time to avoid the contact which afterwards occurred.
We are of course well aware of the landmark case. Rottman v. Beverly, 183 La. 947, 165 So. 153, in which the Supreme Court held that even though a pedestrian may be negligent in getting into a precarious position and even though the negligence may continue until the moment of impact with an oncoming vehicle, there is liability in the driver of the vehicle if he saw the peril in time to avoid the impact and did not do so. We well realize too that in Jackson v. Cook, 189 La. 860, 181 So. 195, the Supreme Court extended that doctrine to the extent of holding that in such a situation, even though the driver of the vehicle may not actually see the pedestrian but could have seen and could have realized the peril had he been on the alert, the driver is liable for the resulting injury to the pedestrian. That doctrine, as properly stated by counsel for plaintiffs in his brief, “means that the courts will hold a negligent defendant liable to a negligent plaintiff if the defendant, aware of the plaintiff’s peril, or unaware of it only through lack of care, had, in fact, a later chance than the plaintiff to avoid the accident.” But, even as stated by counsel, the operator of the vehicle must have a “chance” to avoid the accident. Gant, the operator of the vehicle here did not have such a chance. Mrs. Belshe, through her own negligence was in a position of peril and that peril not only was not discovered by Gant but could not have been discovered by him in time. There was no negligence in Gant.
The judgment appealed from is annulled, avoided and reversed and the suit of plaintiffs is dismissed at their cost.
Reversed.